Case 24-3850, Amanda Caton et al. v. Jacob Salamon et al. Argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellant when ready. Good morning, Your Honors. My name is Katie Barbier. I'm here on behalf of Officers Salamon, Parks, and the City of Loveland in this appeal. I reserve five minutes for rebuttal time. We are here on the issue of qualified immunity here today. This is an illegal interlocutory appeal from summary judgment. We are here on the denial of qualified immunity for Officers Salamon and Parks. We are here on the inextricably intertwined issue of Loveland's denial of summary judgment based upon the underlying constitutional violations. And then we are here on state law claims of Chapter 2744 immunity under Ohio law. So to start with essentially the qualified immunity case and get into those prongs because whether a constitutional violation occurred is assumed under one of those prongs. I'm just going to start first with the clearly established law prong of this case, which I think was not addressed really by the district court in its opinion and I think is a primary basis for our appeal here today. So as the court is well aware, once a defense of qualified immunity is raised, it's on the plaintiff to demonstrate that the defendants are not entitled to qualified immunity. And to show a violation of a clearly established right here under the first prong of this analysis, the plaintiff must identify a case that would put the individual officers on notice that what they were doing was a violation, their specific conduct was unlawful, was a violation of a constitutional right. And as the court and the district court noted in its opinion that the unpublished decisions are not sufficient to establish this, it has to be a published decision from the circuit. So the plaintiffs have not done that here. The district court, I don't believe, made that finding in its opinion. So there are not any cases that are set forth in this decision and in the briefing that would allow these officers to know that their specific conduct was unlawful. Now the only case cited in the summary judgment was on more than the issues that are currently here before the court. So the constitutional violations we're looking at to start with here are the OVI investigation, the arrest that came from the OVI investigation, and then the entry onto the curtilage, which are the 1983 claims that we're kind of discussing here with respect to this. Okay, but looking at the first two, the stuff that happens with the stop, as I understand it, the claim is that everybody knows that you need at least reasonable suspicion to prolong the stop and that you need probable cause in order to arrest. Correct, Your Honor. Okay, and then presumably you're going to say, well, that's too high a level of generality, and so are there any cases that say if you're making up your facts of reasonable suspicion and probable cause, then that is a violation. Officers should know that. So how would you respond as to what the standard is that you have to meet? Well, Your Honor, I would say that there has to be, yeah, what you're suggesting is that there has to be a case on point that would suggest that faced with what these officers, what Officer Solomon and Parks were faced with, the time of day, the location of the stop, what the indications of impairment were, I mean, the different actual specific facts that were facing these officers, whether there's a case on point to say that this is not enough to establish reasonable suspicion, and this is not enough to establish probable cause. The only case that's been cited, I think, in the briefing so far is the United States v. Keith, which the premise of that case is just to hold that the time of day is insufficient to establish reasonable suspicion on its own as its own factor. Okay? And I don't think that that's... Are you saying that that is the only case that plaintiffs brought forward to the district court and in this court? I guess it would have to be in the district court. I'm not saying it's the only case they've referenced in their briefing. Well, right. I'm saying it's the only case that they have suggested, at least... That clearly establishes the law with respect to reasonable suspicion. Right. And it's their burden. And so if we just said we compare it to the facts of this Keith case, then you think you win. Yeah. I mean, I think that the facts of the Keith case, that case found, listen, the time of the day when the Keith stop happened was insufficient on its own to establish reasonable suspicion. You can't just say because it's the middle of the night, I have reasonable suspicion to, you know, conduct any kind of investigatory stop. And I think there's clearly more here in this case than what we're looking at in just time of day. And even I know that there's been an argument through the briefing over the facts and the assumption of facts, and the defendant appellates submit that we have accepted and adopted plaintiff's version of the facts for purposes of this appeal and through the briefing. But even considering the facts that the plaintiffs have, you know, testified to is one... I mean, the time of day is, you know, a factor here because it was the middle, it was 2am, it was the middle of the night. The location of the stop is influential. You know, that was outside of a bar area in the city of Loveland. I mean, you know, the downtown area of Loveland has bars that are open at that time of day. The marked lanes violation. I mean, there's evidence on the video and there was evidence found from the district court that, you know, there was weaving within the lane, that she clearly committed a marked lanes violation when she turned left at the five-point turn onto the...from the downtown road onto the other... I can't...the name is just giving me... It doesn't matter. And the... So here's where it gets a little... But the odor of alcohol. Now, the plaintiffs have testified that Amanda Caton did not smell of alcohol and the inside of the car did not smell of alcohol. There's been no testimony to the effect that Patrick Caton didn't smell of alcohol and that there would be alcohol emanating anywhere around the vehicle. The officers both testified that they smelled alcohol. I don't think that that's contrary to the facts that the plaintiffs have asked us to rely on for purposes of this. OK, so wait a minute. So the officers... I know the officers say, we smelled alcohol on Amanda and in the car. But Patrick says there's no smell of alcohol. Patrick says Amanda Caton did not smell like alcohol and the inside of the car didn't smell like alcohol. But he can't testify to whether he smells like alcohol. But he's not the driver. Right, but he was in the car. Well, yeah, but he's not driving. So even if he smells of alcohol, he's not the driver. Well, I think if he smells of alcohol and alcohol is emanating from Patrick Caton and the officers are standing outside the vehicle... But doesn't the officer specifically say to Amanda, you reek of alcohol? He does say that. And so there's a genuine issue of material fact about that. But isn't that almost the most crucial factor? Because if he says that and it's not true, then it's a strong sign that he's making this stuff up. Well, I mean, it's one indicia. I mean, there's so many more things you can rely on with respect to a reasonable suspicion stop for a DUI, for an OBI infraction. So, I mean, if he sees other indications of impairment, which he also testifies to, you know, the speech, that's a question. So, like, relying on plaintiff's side of the facts, right, we have here is that, you know, I think Patrick Caton testified that Amanda was not slurring and she was talking how she always talked. Now, there also is testimony from Amanda, though, that, you know, she speaks with an impairment, that she has a British accent, that she has a... Does that count as a legal impairment? She speaks with an... I don't think impairment's the right word. She speaks with a... You know, she has a hearing impairment and she speaks differently because of that. And the officer wouldn't know that. And the officer wouldn't know that. So that's what he hears. And I don't think that's... That's not something that's been contradicted in the testimony. You know, so that... Well, why isn't... I want to interrupt you here because you said that they haven't cited any case that would clearly establish that something similar here was unconstitutional. But why isn't Green v. Throckmorton on point here? It doesn't have to be identical. We've said, you know, time and again, that it can't be at such a high level of generality that, you know, it basically is just a general principle. But Green v. Throckmorton has, I think, some similarities here that would maybe qualify. Why not? Because I just think that there are more indications of impairment than there are that appear in Green v. Throckmorton. I mean, you have to consider everything known to the officers, the totality of the circumstances at the time of this stop and this arrest. And with Green v. Throckmorton, I mean, there's more here. There's more indicia that the officers have testified to that are not contradicted. Well, it's very rare that we're going to have something that is identical. But Green v. Throckmorton has quite a few things that are very similar to this case, doesn't it? There are similarities, but I don't think it's enough. I don't think under the Rivas-Villegas v. Corte de Saluna case, the 2021 Supreme Court case, that it's enough. It rises to the standard that the Supreme Court is requiring of these. Do you want to say anything about Officer Parks' involvement here? That is, to what degree was he supervising or involved in the decision-making? Sure. I mean, as you can see from the video, Your Honor, Officer Parks was the backup officer. He was the supervising officer on duty, but he was obviously just backing up Officer Solomon with respect to this. So, you know, his participation was, one, to just make sure that the scene, both officers, both Catons were armed at the time of the stop, right, so to make sure the scene didn't escalate out of control. He arrives exactly after how much has already happened? He arrives when Amanda Caton is already out of the vehicle. So, and he provides, he stands to the side to make sure that nothing goes awry with Patrick Caton, who is still seated inside. So he doesn't know himself all the alcohol who shot John and smelled and so on? He testified that. You know, he testified I smelled alcohol, but I didn't make any kind of conclusions about whether Amanda Caton was impaired or not. I was simply there to provide backup. I see my time is up, so I will yield unless the Court has any questions. All right. Thank you. Good morning, Your Honor. Chris Wiest for the appellees Pat and Amanda Caton. And, Your Honors, where I wanted to begin here, because there's a disconnect, are the facts. And repeatedly, even here today, the appellant wants to assume certain facts and ignore admissions, including by officers, by officers, that are harmful to their theory. And obviously there's a turn in a marked lanes violation. I think we give that up. That's on the video. But let's talk about what the record shows, and I want to talk about also what Park says after he gets on scene to address Judge Boggs' question just a couple minutes ago. Let me back up just a little bit. Officer Solomon joins Loveland PD with a history of dishonesty having been terminated or in the process of being terminated from the Ohio State Patrol with a we will never hire him again because of this incident of dishonesty. So that's a fact. They don't want to address that. They don't want to talk about it. But I think it's important because we've got two Cincinnati police officers who are the plaintiffs in this case that say everything that Solomon says isn't true. The smell, that's not true. The glassy eyes Pat Kane says, that's not true. And so we've got this gentleman with a history of dishonesty and we've got two plaintiffs saying what he's saying isn't true. And then we get into, and this was in the record, it's at document 17-1, there's a number of admissions that Solomon makes in state court that we incorporated below. No flushed red face. He never said that night that she had glassy eyes. By the way, that's at 1385 and 1386. I'm on page IDs. Never said that night that there were glassy eyes, 1389 to 1390. She immediately refutes his accusation of you've been drinking too much, and she denies it, 1392. Never asked to repeat his commands, 1396. He admits that she was coherent and fine answering questions, 1397. He was trained to look for how she exits the car. There were no signs of impairment, 1398. Trained to see how people follow commands. There were no issues there, 1398, 1399. Did not use the door for support to get out of the car, which he was trained to look for, 1399. Didn't lean against the car, which was another clue, 1399 to 1400. No balance problems walking to the cruise or 1400. No staggering, stumbling, or tripping, 1400 to 1401. No swaying, 1401. And then he, and this is at 1406, he asks her to do a walk and turn and she's in heels in the middle of winter. Now, with all due respect, I've not ever walked in heels, but my spouse tells me that that's not an easy thing to do, you know, in the middle of winter, and I have no reason to disbelieve her. And what he says in response to it, and this is on the video too, is you're not going to help me make a decision? So he's not sure what he's dealing with, right? If you're going to view the facts in the light most favorable to the plaintiffs. So, and they don't want to get into that. They don't want to talk about any of the negative facts. In fact, their entire briefing recounts, in the opening brief, a version of facts that they contend is in the light most favorable to them, including after acquired evidence that the officers never even knew about on the scene. That, in our view, deprives the court of jurisdiction. But I do want to talk briefly about, and obviously, Your Honor, you're aware, there's declarations and other evidence that's put on about none of these clues being present. Parks' testimony, and this is at document 15, page ID 586, was that he did not have enough evidence. And by the way, the testimony is he's the supervisor on scene. He did not have enough evidence to determine that she was impaired. Page ID 586. So that's the supervisor saying, I don't have enough evidence that she's impaired, and he makes that admission. And then we've got the plaintiff's expert that says— But he arrived later. He did, Your Honor. I think he was about five minutes into the stop. I mean, can he be held liable for, I mean, failing to stop the arrest? Is that the claim? I think there is a supervision slash—I mean, there's an issue here, I think, because if you look at what's going on, the plaintiff's expert says that there was an improperly administered HGN test. He was qualified to do that. Doc 30— He parks? No, Your Honor. It was Mr. Carotto, who's a— No, but, I mean, when you said he was qualified to administer, you're talking about the expert? Yes, Your Honor, the expert. I see, sorry.  And Parks' testimony is, I don't know if there's enough evidence, but I'm on scene, and he makes that admission, and he has an opportunity to intervene, and he has seen nothing, and he sees Amanda Caton— He wasn't there for the first part of it. It wasn't like two desk officers that are looking at the same file. Most of the supervisory intervention is, you know, one of the officers starts beating the heck out of somebody, and he should intervene and stop, or, you know, one of the officers starts to do a 100-mile-an-hour chase when you're in the car with him. I mean, it seems to query here, you've got, even though he is the supervisor, Salomon's the one who's carrying out the arrest, and he has been there, so he has a greater set of evidence. So do you have cases of any sort about a, quote, supervisor, that is he's simply a higher-ranking officer, who comes on the scene in the middle of things? Should he take over? Now, if he took over, if he said, okay, fellow, I'm in charge, I think you'd have even more. But, you know, help me here in terms of the fact that he simply isn't the one that has all the information to make a judgment. Now, the other guy may make a bad judgment, but in order to require intervention, the judgment doesn't have to be bad enough to trigger intervention? Your Honor, I would say that as for Parks, he is on the scene, and he's on the scene for about 10 minutes, I think, prior to the arrest. There was about 15 minutes that elapsed, and I think he's there for about, I don't think he is, I agree with you, he's not there for the first five minutes of the interaction. He's not. He comes on after. But we've got to look at also what does he know, and what does he admit? And what he admits is, based on what I saw, I didn't have enough evidence to establish he was impaired from what he saw. Right, but does that mean that he has to intervene to stop the arrest made by another officer who he knows has some amount of more information? Now, he doesn't know what that more information is, but there's a third of the interaction here for which Parks wasn't there. So does he have to intervene to stop the arrest? That seems like a hard case. I think, Your Honor, there's a couple of things that color that, right? One of the things that colors that is the knowledge within the Department of Amby Parks about Solomon's statistics, right? He's out there ginning up stops. I think he's – Well, but on that theory, you'd have to stop every arrest the guy makes, right? Or any arrest that, like, if you didn't witness, if you were there and you didn't witness all the facts establishing probable cause for the arrest, you'd have to say, well, this guy maybe lied before, so I've got to jump in and let this person go? I mean – Your Honor, but I think one of the problems here, right, if somebody is impaired and she's stumbling or she's slurring speech or she's doing these things that Solomon says she's doing, and Parks is there long enough to see all of that, and he says, I don't have enough evidence because he doesn't see any of that. Does he say exactly that? That is, I didn't see her stumble when he says she stumbles. I mean, you gave me the summary. Your Honor, his testimony was, I did not have enough evidence to establish she was impaired, page 586. Okay, but he doesn't have all the evidence that Solomon does, number one. And number two is kind of the judgment issue. I mean, suppose you've got three ranking officers, and two of them say, yeah, I thought it was fine, and one of them says it isn't, then the one who says it isn't is the one that you're going to find liable? Well, Your Honor, here, right, I mean, there is ten minutes of interaction prior to the arrest, and in that ten minutes, he is not able to establish enough evidence that she was impaired. That's the admission he makes. And yet the arrest occurs, and he's a supervising officer. And I think it would be different, Judge Larson, if it were a minute, two minutes, three minutes, four minutes. He's there for a period of time, and he's there observing her, and the admission is, I didn't see enough evidence to arrest, and yet he allows it to occur. And I think that that's a problem as a supervisor that's on the scene. If he had said, hey, I was on scene, and, you know, I thought there were clues, you know, maybe something different. But instead the testimony is, yeah, I'm on scene, and I didn't have enough evidence to establish she was. Just to be clear, the liability of Parks is only for the arrest, not for the prolongation? I think that's right. He's there for much less time, if not any of the prolongation.  And on that, and I did want to get into the clearly established law on that as well, on all of this, but obviously Parks was there for the cartilage issue at the end, right? They're both involved in abating up the driveway. So Parks' personal involvement in that aspect. Yeah, but did anything happen in the driveway? I mean, you have to have a seizure in the driveway. Well, Your Honor. Where's the seizure? Yeah, I think what's going on though is this invasion with the body camera and then the release the next day and the salacious sort of outcry as a consequence of what went on in this interaction with Pat Keaton. So we do think that there was a seizure or an invasion. Wait, they're seized by an invasion of privacy? Your Honor, in any Fourth Amendment search kind of case, right, there's always a government invasion of a property. There's no search or seizure that happens at the driveway. They're just escorting her back up the walk. They don't search her. They don't seize her. They're releasing her, in fact. Well, we contend that they were there to generate an incident with Pat Keaton and then release it to the news the next day. So is that a search or a seizure or neither? Your Honor, I'd say it's an aspect. The fact that it's bad.  It sounds like a trespass. I'm sorry. No, we're all. I mean, it was an invasion of privacy. That was the state law claim. We brought over it. And we think it was also a cartilage violation, obviously, under Collins. I did, before I sit down, I wanted to address Collins versus Virginia, Your Honor, on the cartilage issue. Okay, as opposed to Jardines where you have to get up on the porch and have the dog where they say it's okay. It's okay to be all the way up on the porch. It's just you can't bring the dog. Collins was the 2018 U.S. Supreme Court case where it was a car that was parked, you know, basically on the driveway. And the Supreme Court said that's cartilage. If you're in this area right outside the home, that's protected. But why can you walk up the walkway and not up the driveway? I mean, in most suburban homes today, there's a driveway in the front that leads to the walkway to the front door. And Jardines says that a police officer, just like a Girl Scout, has the ability to walk up the front walkway. So in most homes today, the way you get there is from the driveway. You can't connect to that walkway. I think it has to do with how far up they went. But Jardines says you can go all the way to the front door. Well, that's true. That's true, except that you can't be in the driveway. But, I mean, I don't know how you're going to get to the front door without going up the driveway.  But Collins was, again, you go to the driveway, it was a car parked on a driveway. So Collins says that you can't do that. So I think that that's the issue. But isn't Collins really about, you know, it's not the bare trespass. It's a search on the cartilage. There was a search in that case. Yeah. No, no. I mean, if the car was parked 10 feet up the cartilage and you walk in and start searching the car, I'm 100% with you. But that's what they kept them from doing and then they backed off. Right. Your Honor, I did want to address on the detention and the arrest. You know, counsel has taken issue with, you know, no clearly established law. And there's plenty of clearly established law on this issue. Obviously, Rodriguez v. United States, that was a seven-minute detention beyond what was necessary and set forth a bright-line rule. You can do nothing beyond what is necessary to affect the traffic stop, in this instance, to write the ticket. We've got about, you know, a 20-minute detention by the time he makes the arrest from the time of the stop, maybe a little less. Seven or eight minutes was enough in Rodriguez. But Rodriguez sets a bright-line rule. And one of the cases that counsel cited in her brief, actually this court noted was overruled. And, you know, she cites the Everett case by this court out of 2010. U.S. v. Whitley, it was a 2022 case out of this court. 34-F-4-5-22 makes clear that case is no longer good law post-Rodriguez. Rodriguez says any detention without reasonable suspicion is a bright-line rule. That's clearly established law. So that's it on the detention. Although we also got Green v. Throckmorton. I hope I pronounced that correctly. That is a 2012 case. We're dealing with sort of the same issues here. This whole they've manufactured evidence. And, you know, that it's not true. There's other discussion. And I did want to just kind of point out the Akima v. Pence case. I know it was a 2023 case, but it said it was clearly established. Where, in that case, there was no probable cause for arrest, even though the plaintiff had acknowledged drinking, a little bit out of the bottle. The officer said they smelled alcohol, acted erratically, eyes, kind of like we do here. But there was an improper test, just like there was here with an HGN. And this court said no, like there was not probable cause for the arrest. Miller v. Sanilac County, that's another clearly established case, 2010 out of this court. So this prospect, there's not clearly on-point case law that says you can't manufacture evidence. That just is not consistent with this court's case law. I see I'm out of time. All right. Thank you. Thank you, Your Honor. Your Honor, I want to start with Parks here just to kind of address what my opposing counsel mentioned, was that, one, Parks, his job while on scene was to make sure that Patrick Caton didn't act erratically or do anything that would jeopardize the officer's safety. So his vantage point was to stand next to the car in order to see Patrick Caton. He was not interviewing Amanda. He was not reviewing the HGN testing that was going on with Officer Salomon. He was not taking any part in the investigation of Amanda Caton. So when he says, I didn't know whether there was probable cause, your point would be because he wasn't looking for that. That wasn't his job. He was standing off to the side. Right. He was standing to the side making sure that Patrick Caton, with a loaded weapon, didn't get out of his vehicle. I mean, that's truly what he was there for backup for. And then with respect to some of the recitation of the testimony that was set forth in the criminal matter that counsel brought up, I would say that, one, the record is replete with what's going on, with what was seen by Officer Salomon and what the Catons have testified to. But we're on qualified immunity here. We're not on criminal proof here with respect to the motion to suppress hearing or the actual criminal trial here. I mean, an officer, a reasonable officer in Salomon's position, would not know that he was violating a constitutional right. Qualified immunity shields that. Qualified immunity shields an official from suit when he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law. So we're not looking at the strict requirements that a criminal trial would require here for conviction. We're looking at a qualified immunity analysis, which gives the officer some benefit of the doubt here if they reasonably misapprehend the law here. There's ample room for mistaken judgment. And all but the plainly incompetent are those who knowingly violate the law will be held to enjoy qualified immunity. So I think that that needs to be taken into account with respect to what Officer Salomon said he saw. And as I would submit to the court to address the lack of jurisdiction, we have accepted plaintiff's facts. It's true. We've accepted the district court's recitation of the facts with respect to that. So that is to say that she didn't reek of alcohol? Yes, she didn't reek of alcohol is the plaintiff's position on that. But I would submit that there was an alcohol odor. I mean, that doesn't necessarily mean Patrick Caton didn't smell of alcohol, that the cops did not smell alcohol. That's not contradicted or disputed testimony. And I think that there is law from this court that says that the officer's testimony that was not refuted by physical or circumstantial evidence or disputed by contrary testimony can be considered in these kinds of situations and is more qualified immunity. I mean, isn't that almost pure Johnson v. Jones that you are disputing the facts? We are not disputing the facts, Your Honor. We are not. But their view of the facts is she didn't reek of alcohol. He walks up and says you do, which in effect is on their statement of facts he's lying. Right. And that's, Your Honor, that's what I'm saying. We're accepting that. Their facts say that she did not smell of alcohol. What I'm saying is that there is testimony out there that perhaps alcohol was there to be smelled, though, from Patrick Caton or other sources. So I'm just saying that we accept their facts. We're not disputing that. But there are other facts out there that her eyes were fatigued, that were watery. We're not suggesting that. I think that Patrick Caton averred that they were not glassy or bloodshot. So, you know, for purposes of qualified immunity, you know, we're accepting all of their facts as true. That is our position. To address the kind of the curtilage argument with respect to what Your Honors were asking, you know, the testimony is that they were five to ten yards into a driveway, that the driveway extended another 20 to 30 yards. I mean, you can see on the video that they walked up almost to where the sidewalk cuts through a driveway along the, you know, the suburban residential street. They were just beyond that or perhaps standing on the sidewalk. So I would submit that they were not far enough into a curtilage that would trigger that claim here. And then kind of just to briefly, I'm running out of time, but to briefly address the Loveland issue. You know, with respect to Loveland, Maddox v. City of Forest Park, you know, the position is that that's inextricably intertwined. So if the court were to find that there's no constitutional violation here, then Loveland should also be entitled to summary judgment. And then just finally, kind of at the end of my time here with respect to the state law claims, those are false arrest, false imprisonment against Officer Salomon. That's malicious prosecution against Officer Salomon. And then intrusion upon the seclusion, which was kind of mentioned with respect to Officer Parks and Salomon. False arrest and false imprisonment and malicious prosecution, I would submit there was probable cause here so that those claims should not move forward, but also that the officers were entitled to political subdivision immunity. Importantly for the intrusion upon, I see my time is up. If you just want to wrap up briefly. Importantly for intrusion upon the seclusion, especially with respect to Officer Parks, you know, the district court found that he was not malicious, you know, with respect to the other claims. And she never conducted a 2744 immunity analysis with respect to him as to that claim. So, you know, I think that there should be consideration to that, that, you know, he should be, the exceptions to immunity, which is recklessness, maliciousness, bad faith, should be considered here with respect to that. Thank you for your. Thank you. We've been helped by these arguments, and we thank you both for presenting them.